1
2
3
4
5
6
7                    IN THE DISTRICT COURT OF GUAM
8
9    UNITED STATES OF AMERICA,           CRIMINAL CASE NO. 10-00028-003
                                          CIVIL CASE NO. 14-00022
10              Plaintiff,
11        vs.
                                                    **ORDER**
12   HENRY P. FRESNOZA,                      Denying Motion to Vacate
                                          pursuant to 28 U.S.C. § 2255
13              Defendant.
14
15

16        This matter is before the court on Defendant's Motion to Vacate pursuant to 28 U.S.C.

17   § 2255.  *See* ECF No. 295.  Defendant is presently serving a sentence of 20 years imprisonment

18   based on his convictions for drug and money laundering offenses.  For the reasons stated herein, the

19   court denies the motion and declines to grant Defendant a certificate of appealability.

20   **I.    Procedural Background**

21        On May 12, 2010, a federal grand jury returned a multiple-count indictment charging

22   Defendant and two others with various drug and money laundering offenses.  *See* Indictment, ECF

23   No. 1.  The two other codefendants were Gina Fresnoza Medina (the Defendant's sister) and Rodean

24   Villa (Ms. Medina's boyfriend).  They later entered into plea agreements with the Government.  *See*

25   Medina Plea Agreement, ECF No. 76 and Villa Amended Plea Agreement, ECF No. 93.

26        On June 1, 2011, a Superseding Indictment was filed charging Defendant with the following

27   offenses: Conspiracy to Distribute Methamphetamine Hydrochloride (Count I), Conspiracy to Import

28   Methamphetamine Hydrochloride (Count II), Possession of Methamphetamine Hydrochloride with

1   Intent to Distribute (Count III), and Money Laundering (Counts IV-XII).[1]  *See* Superseding

2   Indictment, ECF No. 121.

3          The matter proceeded to a jury trial on October 25, 2011.  On November 3, 2011, the jury

4   returned its verdicts finding the Defendant guilty on the conspiracy to distribute and import

5   methamphetamine hydrochloride counts (Counts I and II), a lesser included offense of Simple

6   Possession of Methamphetamine Hydrochloride (Count III), and four counts of money laundering

7   (Counts IX-XII).  *See* Verdict Form, ECF No. 201.  The Defendant was acquitted of the money

8   laundering charges set forth in Counts IV-VIII.  *Id.*

9          On October 10, 2012, the Defendant was sentenced to 20 years imprisonment each for

10  Counts I and II, two years for Count III, and 20 years each for Counts IX through XII, with the

11  imprisonment terms to run concurrent to each other, and credit for time served.  *See* Judgment, ECF

12  No. 242.

13         On October 22, 2012, the Defendant appealed his conviction and sentence to the Ninth

14  Circuit Court of Appeals.  *See* Notice of Appeal, ECF No. 245.  Based on the Ninth Circuit's

15  Memorandum decision, it appears the Defendant raised two issues on appeal, arguing (1) a violation

16  of the Speedy Trial Act and (2) the court erred in imposing separate sentences for the money

17  laundering charges.  *See* ECF No. 291. On February 21, 2014, the Ninth Circuit Court of Appeals

18  affirmed the conviction and sentence.  *Id.*

19         On December 10, 2014, the Defendant filed the instant Section 2255 motion.  *See* ECF

20  No. 294.  The Government filed a response to the motion on March 27, 2015, *see* ECF No. 299, and

21  the Defendant filed a reply brief thereto on May 4, 2015.  *See* ECF No. 302.

22  **II.     Factual Background**

23          The evidence presented against Defendant at trial showed that various law enforcement

24  agencies had been conducting an investigation into a drug trafficking ring with the Defendant's sister

25  Gina Medina being the primary target.  The investigation spanned many years because Ms. Medina's

26  _____

27          [1] Unlike the original Indictment which reflected a conspiracy period spanning from January
    2004 to the date of the indictment, the Superseding Indictment alleged a shorter time period that
28  began on or about January 2009 through March 2010.

1   drug trafficking activities occurred from about 2004 until March 4, 2010, when Ms. Medina's

2   residence was searched pursuant to a search warrant.  The Government's theory at trial was that the

3   Defendant joined in the drug trafficking conspiracy sometime after he had served a federal sentence

4   on a prior conviction.  The Government called a total of ten witnesses, but the primary witnesses

5   were Drug Enforcement Administration ("DEA") Special Agent Kirk Williamson, Guam Customs

6   and Quarantine Agency Officer Eugene McDonald,[2] Elizabeth Paras,[3] and her ex-husband Ricardo

7   Paras.

8           A.      Testimony of Agents

9           Special Agent Kirk Williamson provided an overview of the case against Ms. Medina.  He

10  stated that information about Ms. Medina first came to the attention of the DEA about 2006 or 2007.

11  Trial Tr., vol. 2, 12, Oct. 26, 2011, ECF No. 258.    He testified that a large seizure of drugs –

12  approximately 242 grams of ice – was made in December 2008 from Richard David at the Guam

13  airport.  Id. at 11.  Agent Williamson stated the ice was supplied by Ms. Medina, and Mr. David was

14  to deliver the ice to Andres Sotelo, who was Ms. Medina's then boyfriend.  Id.  Information obtained

15  from Mr. David's cell phone showed text messages between him and Ms. Medina concerning how

16  the ice was to be packaged and how it was to be divided upon arrival on Guam.  Id. at 17.  Agent

17  Williamson testified that Mr. David then decided to cooperate with law enforcement.  Id.

18          Another break in the investigation occurred on January 26, 2010, when Ricardo Paras was

19  arrested by the Guam Police Department for having drug paraphernalia in his car.  Id. at 19-20.  He

20  agreed to cooperate with law enforcement and provided information regarding financial matters of

21  the organization and how the money was being transmitted through Western Union.  Id. at 20-21.

22  Based on the information provided, agents were able to subpoena more information from Western

23

24  ───────────────

25      [2]  Officer McDonald was a task force officer assigned with the DEA for almost five years.
    Trial Tr., vol. 4, 40, Oct. 31, 2011, ECF No. 260.

26      [3]  Pursuant to an agreement with the United States, in exchange for her testimony the United
27  States agreed it would not prosecute Ms. Paras for her "purchase and use of methamphetamine
    hydrochloride (ice) from Gina Medina or Henry Fresnoza."  See U.S.'s Notice of Letter of Immunity
28  at 2, ECF No. 184 and Closing Jury Instr. 14, ECF No. 191.

1    Union about the financial transactions. *Id.* at 21-22. Agent Williamson testified how Mr. Paras

2    went to law enforcement on February 2, 2010, with $5,500 in cash and later wired said money to the

3    Philippines to the name that Mr. Paras had. *Id.* at 22-23. After wiring the money, Mr. Paras made

4    a recorded phone call to Ms. Medina and provided her with the money transmitter number. *Id.* at 23.

5            Agents had also learned that Mr. Villa was a courier for Ms. Medina and was also involved

6    in the money laundering. *Id.* at 24. Agents were waiting for Mr. Villa to return to Guam from the

7    Philippines. *Id.* at 25. Mr. Villa kept changing his return flight to Guam, but he finally arrived on

8    March 4, 2010, with a companion – Gary Garcia. *Id.* at 25-26. Mr. Garcia was carrying a bag with

9    cakes, and agents later seized approximately 272 grams of ice that had been hidden in the cakes. *Id.*

10   at 26-27. Mr. Garcia agreed to cooperate with the agents. *Id.* at 27. Later that day, agents obtained

11   a search warrant for Ms. Medina's residence at 38 Ukudu Street, Dededo (the "NCS Residence").

12   *Id.*

13           During the search of the NCS Residence, agents observed a surveillance camera mounted to

14   the left of the front door. *Id.* at 30. In the Defendant's bedroom agents found a small viewing screen

15   that was hooked up to the camera at the front of the house and provided live feed into the bedroom.

16   *Id.* at 36-38. On the dresser in the Defendant's bedroom agents found glass pipes, a small plastic bag

17   that contained ice, and other little bags. *Id.* at 40 and 42. Agent Williamsom testified these glass

18   "pipes are used to smoke ice." *Id.* at 41. He also stated that the little baggies were used to put ice

19   in them so that the ice could be sold in smaller quantities. *Id.* at 43. There were also pieces of

20   aluminum foil on the dresser, which the agent testified was associated with drug use because the ice

21   would be placed on the foil, which was then heated up, causing the ice to vaporize and later inhaled

22   by the user. *Id.* Agents also found in the Defendant's bedroom a gram scale. *Id.* at 44. Agent

23   Williamson stated that in association with the other drug paraphernalia found in the room, he

24   believed the scales were used to measure the amount of ice to put into the baggies for purposes of

25   resale. *Id.* Finally, agents found a blue memo book that contained different entries. *Id.* at 48.

26   Agents believed that two pages of this memo book contained the names of people to whom the

27   Defendant sold ice and the amounts owed to him for that ice. *Id.* at 50-51. Among the names in the

28   memo book was the name "Sheila." *Id.* at 52. Agent Williamson testified that they were never able

1  to get a last name on this individual but agents kept receiving information about a Sheila who was

2  associated with Ms. Medina's group. *Id.* at 53.

3        During cross-examination, Agent Williamson testified that Ms. Paras was cooperating with

4  the agents and she admitted she had brought a large quantity of drugs on her person from the

5  Philippines in the past. *Id.* at 61.

6        Officer McDonald testified that he was involved in the investigation of Ms. Medina's drug

7  trafficking ring. Trial Tr., vol. 4, 41, Oct. 31, 2011, ECF No. 260.  He was involved in the

8  surveillance of Sofia San Agustin beginning about April 2007 or 2008. *Id.*  About September 2008,

9  Officer McDonald received information that Mr. Sotelo was providing ice to Ms. San Agustin. *Id.*

10  at 42. Mr. Sotelo was then living in Dededo, but previously Officer McDonald testified that Mr.

11  Sotelo had been staying at the NCS Residence. *Id.* at 42-43. Officer McDonald stated that he was

12  also involved in the surveillance of Mr. Sotelo when he was at the NCS Residence. *Id.* at 43.  He

13  witnessed cars coming to the residence and only staying for a short period (from one to three minutes

14  at a time). *Id.*

15        Officer McDonald corroborated the testimony of Agent Williamson with regard to the seizure

16  of drugs from Mr. David and his subsequent cooperation with law enforcement. *Id.* at 44-50.

17        Officer McDonald testified that in April 2008, they executed a search warrant on Ms. San

18  Agustin's home. *Id.* at 51.  She agreed to cooperate with law enforcement, and agents learned that

19  she was having an affair with Mr. Sotelo. *Id.* at 51 and 53.

20        Officer McDonald's testimony corroborated Agent Williamson's statements with regard to

21  the cooperation provided by Mr. Paras with regard to the names of people he was wiring money to

22  and the names of others who were also wiring money.  *Id*. at 54-55.  Officer McDonald also

23  corroborated Agent Williamson's account of the events regarding the seizure of drugs from Mr. Villa

24  and Mr. Garcia on March 4, 2010. *Id.* at 65-70.

25        Officer McDonald stated he was involved in the execution of the search warrant on the NCS

26  Residence. *Id.* at 74. With regard to the surveillance camera near the front door, Officer McDonald

27  testified that all the drug dealers he's arrested have had this sort of camera facing the entrance of

28  their residences in order to protect their assets and also to see who is approaching their residences.

1    *Id.* at 71.  He stated that in his experience, if drug dealers see police approaching the residence, they

2    "rush to the bathroom and try and flush whatever they have."  *Id.* at 71-72.

3        Officer McDonald also testified about the drugs and drug paraphernalia found in Ms.

4    Medina's bedroom, including two gram scales, a shot glass with methamphetamine hydrochloride

5    residue, three glass pipes used to smoke ice, clear straws used to hold ice, and small plastic

6    resealable  bags capable of holding a gram or more of ice.  *Id.* at 75-86.

7        Officer McDonald's testimony with regard to the drug paraphernalia seized from the

8    Defendant's bedroom corroborated the earlier testimony of Agent Williamson.  *Id.* at 87-95.  Officer

9    McDonald also testified that personal items belonging to the Defendant were found in his bedroom,

10   such as a First Hawaiian Bank envelope with his name on it, his passport, and Bank of Guam records

11   for an account number in Defendant's name.  *Id.* at 93-94.

12       B.    <u>Testimony of Elizabeth Paras</u>

13       According to the testimony of Ms. Paras, sometime after Typhoon Pongsona struck Guam

14   in December 2002, she, her husband and their two kids moved to a home in Liguan Terrace.  *See*

15   Trial Tr., vol. 3, 30-31,  Oct. 27, 2011, ECF No. 259.  It was then that she met Ms. Medina through

16   a mutual friend.  *Id.* at 31.  Ms. Medina and her then boyfriend Mr. Sotelo also lived in Liguan

17   Terrace, approximately two streets from the home of Ms. Paras.  *Id.* at 31-32.  Initially, their

18   socialization involved playing cards together, but later Ms. Paras began smoking ice with Ms.

19   Medina.  *Id.* at 32-34.

20       Ms. Paras and her family lived in Liguan Terrace for about one year and later moved to

21   Barrigada.  *Id.* at 37.  Ms. Medina and Mr. Sotelo had also moved out by then because the house they

22   were living in was raided.  *Id.* at 38.  Ms. Medina then moved to Machanao before moving to the

23   NCS Residence.  *Id.*    Ms. Paras did not see Ms. Medina as often anymore, *id.*, but sometime in

24   2004[4] Ms. Medina invited Ms. Paras to travel with her to the Philippines to visit her family.  *Id.* at

25   39. Ms. Medina purchased Ms. Paras's plane ticket to the Philippines, and they stayed for about two

26   

---

27      [4]  Ms. Paras initially could not recall the year of this trip.  *Id.* at 39.  Later, however, she
     testified that after having stayed in the Philippines for two months, she returned to Guam with Ms.
28   Medina and Mr. Sotelo on November 26, 2004.  *Id.* at 42-43.

1   months. *Id.* Before they returned to Guam, Ms. Medina asked Ms. Paras to carry ice back to Guam

2   for her. *Id.* at 42. Ms. Paras told her she did not want to, but eventually Ms. Paras was given a carry-

3   on bag that contained the ice packaged by Ms. Medina.[5]  *Id.* at 46. In exchange for helping Ms.

4   Medina bring the ice to Guam, Ms. Paras received $300 which she used to renew her green card.

5   *Id.* at 47.

6          Ms. Medina asked Ms. Paras to carry ice again for her sometime in mid-December 2004, but

7   Ms. Paras refused. *Id.* at 47-48. As a result, Ms. Paras testified that Ms. Medina did not speak with

8   Ms. Paras any longer and began hanging out with different friends, including a woman named Sheila

9   (last name unknown). *Id.* at 48. According to Ms. Paras, Sheila would get ice from Ms. Medina and

10  sell it. *Id.* at 48-49.

11         Ms. Paras later became aware that Ms. Medina left Guam for the Philippines, but Mr. Sotelo

12  continued to live in the NCS Residence until sometime in 2009. *Id.* at 51-52. When Ms. Medina

13  later returned to Guam, Ms. Paras went to the NCS Residence to visit her. *Id.* at 53. They rekindled

14  their friendship and Ms. Paras went to the NCS Residence about once every two weeks. *Id.* at 56.

15  Every time Ms. Paras visited the NCS Residence she would always see the Defendant there. *Id.*

16  at 58. Ms. Paras testified the Defendant stayed in one of the rooms and kept his clothes[6] there. *Id.*

17  at 58. Ms. Paras further stated that when she visited the residence she would smoke ice with

18  Ms. Medina, Rodean Villa and the Defendant. *Id.* at 58-59. When questioned about where in the

19  residence Ms. Medina would retrieve the ice, Ms. Paras stated Ms. Medina would either go into her

20  room or into the Defendant's room to get the ice. *Id.* at 59. Ms. Paras also testified that she

21  observed Sheila at the NCS Residence buying ice from Ms. Medina. *Id.* at 60. Sheila would

22  sometimes give the money to Ms. Medina or sometimes to the Defendant. *Id.*

23

24  ─────────────

25      [5] During cross-examination, Ms. Paras stated she did not know the amount of drugs brought
    in for Ms. Medina, but Ms. Paras confirmed that she told the DEA that it was about one "kilo." *Id.*

26  at 68.

27      [6] *See also* Trial Tr., vol. 3, 63-64, Oct. 27, 2011, ECF No. 259 (Ms. Paras described an
    incident where she and Ms. Medina went to a laundromat to wash the Defendant's clothes, along

28  with the clothes of the Defendant's girlfriend and her children).

1    Defense counsel questioned Ms. Paras about money she sent to the Philippines in 2010 for

2    Ms. Medina. *Id.* at 68. Ms. Paras stated that the $3,000 she wired to the Philippines was not for

3    Ms. Medina but was for Mr. Villa. *Id.* During re-direct, Ms. Paras explained that she had asked

4    Ms. Medina to give her a ride and later Mr. Villa called Ms. Medina on her cell phone and asked

5    Ms. Medina to send him money for wheel rims for a car. *Id.* at 81-82. Ms. Medina did not have an

6    ID with her at the time, so Ms. Paras used her ID to send Mr. Villa the money. *Id.* at 82.

7         C.    Testimony of Ricardo Paras

8         Mr. Paras's testimony was consistent with Ms. Paras's statements that he and his ex-wife

9    became friends with Ms. Medina and Mr. Sotelo while they were living in Liguan Terrace. *Id.* at 88-

10   89. Ms. Medina and Mr. Sotelo gave him ice to smoke, which he paid for sometimes. *Id.* at 89.

11   Mr. Paras stated he met several other individuals who were also using ice at Ms. Medina's residence,

12   including Gilbert Ladonga and Mr. Villa. *Id.* at 90-91.

13        Mr. Paras corroborated that after Ms. Medina and Mr. Sotelo moved out of Liguan Terrace,

14   they moved to a house located in Machanao before moving to the NCS Residence. *Id.* at 92-93. He

15   testified that he continued to visit Ms. Medina and Mr. Sotelo many times there and would smoke

16   ice with them. *Id.* at 93-94. Mr. Paras recalled that Ms. Medina left Guam for some time and was

17   living in the Philippines, but Mr. Sotelo still lived at the NCS Residence. *Id.* at 94. According to

18   Mr. Paras, two other individuals – Robert Sherry and Joe Caballero – also stayed at the NCS

19   Residence with Mr. Sotelo. *Id.* at 95-97. Although Ms. Medina was no longer on Guam, Mr. Paras

20   continued to visit the house and buy ice from Mr. Sotelo and Mr. Sherry. *Id.* at 97. During this time,

21   Mr. Paras also saw the Defendant buying ice from Mr. Sherry. *Id.* at 105-106. He stated that the

22   Defendant would check on Mr. Sherry every weekend, and Mr. Sherry would give the Defendant ice

23   and some cash. *Id.* at 106. At some point in time, the three men moved out of the NCS Residence,

24   although Mr. Paras could not recall the specific dates this occurred. *Id.* at 95, 98 and 100.

25        Eventually, Ms. Medina returned to Guam from the Philippines, and Mr. Paras would visit

26   her at the NCS Residence to smoke ice with her. *Id.* at 100-101. He testified that Ms. Medina would

27   not charge him for the ice. *Id.* at 102. He further stated that the Defendant resided in one of the

28   rooms at the house. *Id.* When asked how often he would visit Ms. Medina's house, Mr. Paras

1  testified that he would go there almost everyday and see Ms. Medina, Mr. Villa and the Defendant

2  at the home. *Id.* at 103. Mr. Paras stated he received ice from the Defendant about three times, *id.*,

3  and from Ms. Medina and Mr. Villa too. *Id.* at 103-04. Mr. Paras testified that the ice would usually

4  be retrieved from the closet or drawer in Ms. Medina's room. *Id.* at 104.

5        Mr. Paras also stated that he knew the Defendant installed the surveillance camera at the NCS

6  Residence before Ms. Medina returned to Guam, although he did not personally see the Defendant

7  install the camera. *Id.* at 105.

8        Mr. Paras testified that before Ms. Medina came back from the Philippines, he saw the

9  Defendant and some friends moving a dresser and a bed into the Defendant's bedroom at the NCS

10 Residence. *Id.* at 107-08. Mr. Paras also stated that prior to the Defendant living with his sister, the

11 Defendant resided with his brother Ruben Fresnoza in Mangilao. *Id.* at 132-33.

12       With regard to the money laundering charges in the Superseding Indictment,[7] Mr. Paras stated

13 that it began with Ms. Medina asking him to send the money to the Philippines. *Id.* at 108-09. Mr.

14 Paras went to her house, and Ms. Medina was there with Mr. Villa. *Id.* at 111. Ms. Medina handed

15 him an envelope of money with a name written on the envelope of the individual Mr. Paras to whom

16 Mr. Paras was to wire the money. *Id.* at 112. After he wired the money as instructed, Mr. Paras

17 received a money transaction number, which he then gave to Ms. Medina. *Id.* at 110. In exchange

18 for wiring the money to the Philippines for her, Ms. Medina gave him ice. *Id.* at 109. Mr. Paras

19 stated he did a lot of these money wires for her. *Id.* at 112. He further testified that he knew the

20 money was for drugs. *Id.* at 114. Mr. Paras identified various Government exhibits as the money

21 transfer forms and computer generated transaction receipts for the money transfers he sent for Ms.

22 Medina. *Id.* at 109-10, 113-15, 125-126 and 129-30.

23       The Government also questioned Mr. Paras about records reflecting that both Mr. Paras and

24

25       [7] The Government charged Mr. Paras in a separate case with five counts of money
26 laundering. *See United States v. Ricardo S. Paras, Jr.*, Criminal Case No. 10-00041. These five
counts of money laundering corresponded to Counts IV through VIII in the Indictment against the
27 Defendant. Mr. Paras eventually entered into a plea agreement with the Government and pled guilty
to one count of money laundering. *See* Amended Plea Agreement, ECF No. 16 in Criminal Case No.
28 10-00041.

1   Mr. Ladonga wired money to the Philippines on the same day.  With regard to the January 2010

2   money transfers, Mr. Paras explained that he and Mr. Ladonga met at Ms. Medina's house.  *Id.*

3   at 121.  Ms. Medina gave each of them money.  *Id.*  Mr. Paras then left by himself to wire the money,

4   while Mr. Ladonga was taken by Mr. Villa to a separate location to wire the money as instructed by

5   Ms. Medina.  *Id.* at 121-22.  Mr. Paras also testified about a similar incident that occurred on

6   January 30, 2010.  *Id.* at 126-128.

7           On January 26, 2010, Mr. Paras began cooperating with ATF after he was pulled over by the

8   police for illegal parking.  *Id.* at 122-23.  His car was searched and in his pocket police found half

9   a gram of ice.  *Id.* at 123.  He was thereafter arrested and agreed to cooperate with ATF agents.  *Id.*

10  at 123-24.  A few days following his arrest, he met with the agents and told them about the money

11  he had been wiring.  *Id.* at 124-25.  They instructed him that before he received money the next time,

12  he was to call them.  *Id.* at 125.

13          Money transfer records showed that both Mr. Paras and Mr. Ladonga each wired $5,500 to

14  the Philippines on February 2, 2010.  Mr. Paras stated that when he received the money from

15  Ms. Medina he contacted the ATF.  *Id.* at 130.  He then proceeded to the ATF office and

16  photocopied the money.  *Id.* at 131.  The ATF agent and Mr. Paras then proceeded to Western Union

17  to wire the money.  *Id.*  Mr. Paras then telephoned Ms. Medina to give her the wire transfer number.

18  *Id.*  This telephone conversation was recorded by the ATF.  *Id.*  Mr. Paras did not wire any more

19  money after the February 2nd transaction.  *Id.*

20          When questioned about where Ms. Medina would retrieve the money she gave to Mr. Paras,

21  he stated that Ms. Medina would go "to Henry's room first" and come out with the envelopes of

22  money that she would give to him.  *Id.* at 132.  Mr. Paras testified that the Defendant would

23  "sometimes" be standing beside Ms. Medina when she handed him the envelopes.  *Id.*

24  **III.    Applicable Legal Standards**

25          Defendant brings the instant motion to collaterally attack his convictions pursuant to

26  28 U.S.C. § 2255.  Section 2255 permits a federal prisoner seeking relief from a custodial sentence

27  to "move the court which imposed the sentence to vacate, set aside or correct the sentence" upon "the

28  ground that the sentence was imposed in violation of the Constitution or laws of the United States,

1   or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess

2   of the maximum authorized by law, or is otherwise subject to collateral attack[.]" 28 U.S.C.

3   § 2255(a). To obtain relief under Section 2255, a prisoner must allege a constitutional,

4   jurisdictional, or otherwise "fundamental defect which inherently results in a complete miscarriage

5   of justice [or] an omission inconsistent with the rudimentary demands of fair procedure." *Hill v.*

6   *United States*, 368 U.S. 424, 428 (1962). Furthermore, Section 2255 is not to be used as a substitute

7   for direct appeal. *See United States v. Frady,* 456 U.S. 152, 165 (1982) and *Raiford v. United States*,

8   483 F.2d 445, 446 (9th Cir.1973).

9   **IV.    Analysis**

10       Defendant's Section 2255 motion asserts four main grounds: (1) "Actual Innocence: Abuse

11   of Discretion," (2) Ineffective Assistance of Counsel, (3) Prosecutorial Misconduct and (4)

12   Cumulative Effect of Errors Violated Due Process. *See* Section 2255 Mot. at ¶¶17(a)-(d), ECF

13   No. 294. Defendant's Memorandum of Law in support of his motion alleges numerous sub-issues

14   related to the four main grounds listed. However, before discussing in greater detail the specific

15   claims raised in the Section 2255 motion, the court will first address the Defendant's request,

16   pursuant to 28 U.S.C. § 455, that the below-signed judge recuse herself from ruling on this matter

17   based on allegations that the court abused its discretion.[8] *See* Movant's Mem. of Law at 3, ECF

18   No. 294.

19       A.    <u>Recusal</u>

20       Rule 4(a) of the Rules Governing Section 2255 Habeas Proceedings directs that a habeas

21   petition "be presented promptly to the judge of the district court who presided at the movant's trial

---

23   [8] The United States' Answer to the Defendant's Section 2255 Motion did not address this
     issue, nor did it address the Defendant's request that the United States Attorney's Office assign a
24   different Assistant United States Attorney ("AUSA") other than the prosecutor who took the matter
     to trial to respond to his motion. *See* USA Answer, ECF No. 299. The United States' Answer was
25   a scant six pages in length and failed to address many of the issues raised in the Defendant's 45-page
     motion, which included a 33-page Memorandum of Law. In our adversarial system of justice,
26   inadequate briefing deprives the court of the benefit of reasoned analysis from all parties. In the
     future, the United States should endeavor to prepare a more thorough response to all motions.
27       As for the Defendant's request to assign a different AUSA, the matter is moot since the
     original prosecutor is no longer with the U.S. Attorney's Office for this district.

1   and imposed sentence, or if the judge who imposed sentence was not the trial judge, to the judge who

2   conducted the proceedings being challenged."  Although there has been some criticism of this same-

3   judge assignment rule, the Advisory Committee nevertheless adopted "the majority rule," stating that

4   "[b]ecause the trial judge is thoroughly familiar with the case, there is obvious administrative

5   advantage in giving him [or her] the first opportunity to decide whether there are grounds for

6   granting the motion."  Rule 4 of the Rules Governing Section 2255 Proceedings for the United States

7   District Courts advisory committee's note to 1976 adoption.  The Advisory Committee also noted

8   that any movant who "feels this is unfair to him" may "file an affidavit of bias."  *Id.*

9           Here, Defendant's motion asserts this court has abused its discretion and thus Defendant

10  seeks recusal pursuant to 28 U.S.C. § 455.  Section 455(a) provides that "[a]ny justice, judge, or

11  magistrate judge of the United States [shall] disqualify himself in any proceeding in which his

12  impartiality might reasonably be questioned."  28 U.S.C. §455(a).  Additionally, a judge is also

13  required to disqualify herself if she has a "personal bias or prejudice concerning a party, or personal

14  knowledge of disputed evidentiary facts concerning the proceedings." 28 U.S.C. § 455(b)(1).  The

15  undersigned judge, nonetheless, has a duty to sit in all cases that come before me when there is no

16  legitimate reason to recuse myself.  *United States v. Holland*, 519 F.3d 909 (9th Cir. 2008); *see also*

17  *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1312 (2d Cir. 1998) ("A judge is as much

18  obliged not to recuse himself when it is not called for as he is obliged to when it is.").

19          The test for recusal is an objective one – whether a "reasonable person with knowledge of

20  all the facts would conclude that the judge's impartiality might reasonably be questioned." *Blixseth*

21  *v. Yellowstone Mountain Club, LLC,* 742 F.3d 1215, 1219 (9th Cir. 2014) (quotation and citation

22  omitted).  This "reasonable person" means a "well-informed, thoughtful observer, as opposed to a

23  hypersensitive or unduly suspicious person." *Clemens v. United States Dist. Ct. for the Central Dist.*

24  *of Cal.*, 428 F.3d 1175, 1178 (9th Cir. 2005) (citation and quotations omitted).  "The reasonable

25  third-party observer is not a 'partly informed man-in-the-street,' but rather someone who

26  'understand[s] all the relevant facts' and has examined the record and law." *Holland*, 519 F.3d

27  at 914 (quoting *LoCascio v. United States*, 473 F.3d 493, 496 (2d. Cir. 2007)).

28          Additionally, Section 455(a) " is limited by the 'extrajudicial source' factor which generally

1  requires as the basis for recusal something other than rulings, opinions formed or statements made

2  by the judge during the course of trial." *Holland*, 519 U.S. at 913-14.  As the Supreme Court

3  explained:

> First, judicial rulings alone almost never constitute a valid basis for a bias or
> partiality motion.  In and of themselves . . . they cannot possibly show reliance upon
> an extrajudicial source . . . .  Second, opinions formed by the judge on the basis of
> facts introduced or events occurring in the course of the current proceedings, or of
> prior proceedings, do not constitute a basis for a bias or partiality motion unless they
> display a deep-seated favoritism or antagonism that would make fair judgment
> impossible.  Thus, judicial remarks during the course of a trial that are critical or
> disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do
> not support a bias or partiality challenge. They may do so if they reveal an opinion
> that derives from an extrajudicial source; and they will do so if they reveal such a
> high degree of favoritism or antagonism as to make fair judgment impossible.  Thus,
> judicial remarks during the course of a trial that are critical or disapproving of, or
> even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias
> or partiality challenge.  They *may* do so if they reveal an opinion that derives from
> an extrajudicial source; and they *will* do so if they reveal such a high degree of
> favoritism or antagonism as to make fair judgment impossible.

13  *Liteky v. United States*, 510 U.S. 540, 555 (1994) (emphasis in original).

14      Applying these principles to the instant case, the court finds that none of the grounds

15  Defendant asserts requires disqualification.   The court has carefully reviewed Defendant's motion

16  and memorandum in support.  Defendant has not demonstrated or even suggested any extrajudicial

17  bias.  Instead, Defendant's claims are premised only on events that occurred during the course of

18  Defendant's underlying criminal case.  Furthermore, no reasonable person reviewing the facts

19  alleged in the Section 2255 motion would conclude that the undersigned's impartiality might

20  reasonably be questioned in this action.  Accordingly, to the extent Defendant seeks recusal of the

21  undersigned from this matter, his request is denied.

22      Having denied the request to recuse, the court will now address the merits of the

23  Section 2255 motion.  In its Answer to Defendant's motion, the Government asserts that since he

24  failed to raise these issues on direct appeal, these claims are procedurally barred and Defendant can

25  not raise them in his Section 2255 motion.  Accordingly, the court will next discuss whether

26  Defendant's claims are barred.

27      B.    Procedural Default

28      The general rule is that a criminal defendant procedurally defaults his Section 2255 claims

1    if he could have raised them on direct appeal but failed to do so. *Massaro v. United States*, 538 U.S.

2    500, 504 (2003); *United States v. Ratigan*, 351 F.3d 957, 962 (9th Cir. 2003). "The

3    procedural-default rule is neither statutory nor a constitutional requirement, but it is a doctrine

4    adhered to by the courts to conserve judicial resources and to respect the law's important interest in

5    the finality of judgments." *Massaro*, 538 U.S. at 504. Accordingly, Section 2255 "is not designed

6    to provide criminal defendants multiple opportunities to challenge their sentence." *United States v.*

7    *Johnson*, 988 F.2d 941, 945 (9th Cir. 1993).

8          An exception to the procedural default rule exists when a petitioner raises a claim of

9    ineffective assistance of counsel. *Massaro,* 538 U.S. at 509. Such claims may be brought in a

10   collateral proceeding under Section 2255, "whether or not the petitioner could have raised the claim

11   on direct appeal." *Id.*

12         For other procedurally defaulted claims, federal courts may consider the merits if a petitioner

13   can show: (1) "cause" for not raising the claim sooner and "actual prejudice" resulting from the

14   alleged error; or (2) his "actual innocence." *Bousley v. United States*, 523 U.S. 614, 622 (1998);

15   *Ratigan*, 351 F.3d at 960. To demonstrate "cause" for procedural default, a petitioner "must show

16   that 'some objective factor external to the defense' impeded his adherence to the procedural rule."

17   *United States v. Skurdal*, 341 F.3d 921, 925 (9th Cir. 2003) (quoting *Murray v. Carrier*, 477 U.S.

18   478, 488 (1986)). To show "prejudice," a petitioner "must shoulder the burden of showing, not

19   merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual*

20   and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."

21   *Frady*, 456 U.S. at 170 (emphasis in original). A district court need not address both the cause and

22   prejudice prongs if the petitioner fails to satisfy one. *Id.* at 168.

23         The standard for overcoming a procedural default via "actual innocence" is more stringent.

24   "Actual innocence" is an equitable remedy that permits a petitioner to obtain collateral review of a

25   procedurally defaulted claim. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). "To invoke the actual

26   innocence exception, [petitioner] must show that in light of all the evidence, 'it is more likely than

27   not that no reasonable juror would have found [him] guilty beyond a reasonable doubt.'" *United*

28   *States v. Avery*, 719 F.3d 1080, 1083 (9th Cir. 2013) (*quoting Schlup*, 513 U.S. at 327).

1    The court now turns to the claims themselves to address whether Defendant has made the

2    requisite showing of cause and prejudice in the context of his individual claims.

3              C.       Actual Innocence:  Abuse of Discretion by Trial Court

4         Defendant's first claim is that "he is actually innocent based in part for (sic) Abuse of

5    Discretion." Movant's Mem. of Law at 3.  Defendant asserts that he recently received copies of the

6    grand jury transcripts, jury instruction and verdict forms, and thus was prevented from having his

7    counsel file on direct appeal the claims he now raises.  Defendant further claims that appellate

8    counsel did not consult him with regard to the issues to be raised on direct appeal and that appellate

9    counsel "abandoned all viable issues on direct review," presenting instead "frivolous argument"

10   dealing with grouping offenses.

11        The court will later discuss Defendant's claim that counsel was ineffective both at trial and

12   on appeal.   However, to the extent Defendant asserts the actual innocence exception to the

13   procedural bar, his argument is without merit and the court can dismiss it here at the outset.  At trial,

14   the Government offered sufficient evidence of Defendant's guilt based on the testimonies of the

15   various witnesses.  Nothing Defendant presented in his lengthy petition and memorandum creates

16   sufficient doubt about the validity of his conviction to warrant setting aside the default.   For

17   example, Defendant appears to argue that the testimony of Mr. Villa would have cleared him of the

18   conspiracy counts.  According to the Defendant's motion, Mr. Villa maintained that Defendant did

19   not live in the NCS Residence nor was he involved in the drug trafficking conspiracy. *See* Movant's

20   Mem. of Law at 6-7, ECF No. 294.  Mr. Villa, however, was not called as a witness at trial by either

21   the Government or the defense.  The Government has the option of proving its case at trial using

22   witnesses of its choice, and it chose not to call Mr. Villa, perhaps because Mr. Villa's statements to

23   law enforcement was contradicted by the physical evidence (*e.g.*, numerous personal items of the

24   Defendant found in one of the bedrooms at the NCS Residence) and the testimonies of Ms. Paras and

25   Mr. Paras.

26        Defendant further asserts that the testimonies of Mr. Paras and Ms. Paras "failed to show that

27   [he] sold drugs or conspired to sell drugs, or that [he] helped in the importation of drugs." Movant's

28   Mem. of Law at 11, ECF No. 294.  Ms. Paras testified that every time she visited the NCS Residence

1    after Ms. Medina returned from the Philippines, the Defendant would be there, and she smoked ice

2    with Ms. Medina, Mr. Villa and the Defendant. Ms. Paras also stated that Ms. Medina would

3    retrieve the ice from her bedroom or the Defendant's room. Additionally, Ms. Paras testified that

4    Sheila would buy ice from Ms. Medina and sometimes give the money to the Defendant. As for Mr.

5    Paras, he stated that before Ms. Medina came back from the Philippines, the Defendant installed a

6    surveillance camera at the NCS Residence. Mr. Paras also stated that he knew that Defendant

7    resided in one of the bedrooms at the NCS Residence because he saw the Defendant and others

8    moving furniture into the Defendant's bedroom at the home and the Defendant was always there

9    when he visited Ms. Medina almost daily. Mr. Paras testified that Defendant provided him with ice

10   about three times. He also stated that when Ms. Medina would give him money to wire – money he

11   knew was for drugs – she would go to Defendant's room first and come out with the envelope of

12   money to wire. Mr. Paras testified that the Defendant would sometimes be standing beside

13   Ms. Medina when she handed him the envelope. The agents also testified about the various

14   individuals who were involved in Ms. Medina's drug ring who were later apprehended at the airport

15   bringing ice to Guam from the Philippines. Agents found in the Defendant's bedroom various

16   personal items belonging to the Defendant, including clothing, his passport, and financial papers

17   (bank statement and checkbooks). *See* Exs. 11-14 to 11-16, 11-19 to 11-20, and 11-22 to 11-23 to

18   11-24. Agents also found a digital scale, glass pipes, a small plastic bag that contained

19   methamphetamine hydrochloride and a small notebook containing what was believed to be drug

20   records in Defendant's room. *See* Exs. 11-10 to 11-13, 11-22 and 17. Based on the testimony and

21   the evidence, the jury found that the Defendant was more than just a mere spectator; instead,

22   Defendant was a participant in the conspiracies alleged. In light of all the evidence, Defendant has

23   not shown that "it is more likely than not that no reasonable juror would have found [him] guilty

24   beyond a reasonable doubt." *Schlup*, 513 U.S. at 327. Defendant has failed to satisfy the stringent

25   standard required for an actual innocence claim.

26        Defendant asserts this court abused its discretion in various ways. First, Defendant argues

27   that there is no federal law or statute for conspiracy to import as charged in Count 2 of the

28   Superseding Indictment. Defendant asserts the court acknowledged on the record that there was no

1    federal law on conspiracy to import and failed in its duty to dismiss this count. The Defendant is

2    simply mistaken. The Superseding Indictment charged the Defendant with Conspiracy to Import

3    Methamphetamine Hydrochloride in violation of 21 U.S.C. §§ 952 & 963 and 18 U.S.C. § 2.

4    Section 952 makes it unlawful to import controlled substances into the United States from any place

5    outside thereof, and Section 963 make is unlawful for "[a]ny person who attempts or conspires to

6    commit any offense defined in . . . subchapter [II]," which includes Section 952. Thus, federal law

7    precisely prohibits the conduct charged in Count II, specifically conspiring to import controlled

8    substances. The Defendant's assertion that Conspiracy to Import Methamphetamine Hydrochloride

9    is a "non-existent federal crime" has no merit.

10          The court believes the Defendant simply misunderstood the court's statements. When the

11   court was going over the proposed final jury instructions, the court noted that there was no specific

12   Ninth Circuit model jury instruction to cover the offense of Conspiracy to Import Methamphetamine

13   Hydrochloride.   *See* Trial Tr., vol. 4, 151, Oct. 31, 2011, ECF No. 260. Thus, the court merged

14   two model instructions – 8.20 setting forth the elements of a general conspiracy and 9.32 which set

15   forth the elements for unlawful importation of a controlled substance – to form what became final

16   Closing Instruction No. 17. *See* Closing Jury Instr. at 19-20, ECF No. 191. Both the Government

17   and defense counsel had no objections to the giving of this instruction. *Id.* at 153-154.

18          Defendant next asserts a variety of alleged errors by this court with regard to jury instructions

19   given and alleges this court "continued to manipulate the jurors by giving jury instructions on

20   different elements on the drug counts and money laundering counts that were not in the indictment."

21   Movant's Mem. of Law at 8, ECF No. 294. Defendant contends the court erred when it "left out the

22   3rd prong" of Closing Instruction No. 18 because it "relieved the government of its burden of proof."

23   *Id.* at 8-9. Closing Instruction No. 18 sets forth the elements with regard to Count III (Possession

24   with Intent to Distribute) and was patterned after Ninth Circuit Model Jury Instruction 9.15. The

25   only difference between the two instructions is that Closing Instruction No. 18 does not contain the

26   following bracketed paragraph found in Model Jury Instruction 9.15: "The government is not

27   required to prove the amount or quantity of [specify controlled substance]. It need only prove

28   beyond a reasonable doubt that there was a measurable or detectable amount of [specify controlled

1   substance].”  The commentary to Model Jury Instruction 9.15 states that this bracketed paragraph

2   should be used “only when quantity is not at issue.”  Contrary to Defendant's assertions, deleting

3   said paragraph did not relieve the Government of its burden of proof because the Government still

4   had to prove the two necessary elements for this offense, namely (1) that the Defendant knowingly

5   possessed drugs and (2) he possessed it with intent to deliver the drugs to another person.  Even if

6   the court accepted the Defendant's contention that it should have included this so-called “3rd prong,”

7   the Defendant was not prejudiced because the jury found him not guilty of possession with intent to

8   distribute and instead convicted him on a lesser included offense of simple possession.  Furthermore,

9   it was defense counsel who asked for an instruction on the lesser included offense of simple

10  possession. *See* Trial Tr., vol. 4, 170, Oct. 31, 2011, ECF No. 260.  Thus, Defendant's assertion that

11  this court improperly amended Count III to include a lesser included offense is without merit.

12      He also alleges that Jury Instruction 21 was confusing.  *Id.* at 9.  Closing Instruction No. 21

13  is a standard jury instruction and was based on Ninth Circuit Model Jury Instructions 8.23.  The court

14  finds nothing confusing or erroneous about the instruction.  In fact, neither the Government nor

15  defense counsel objected to this instruction.  Trial Tr., vol. 4, 159-61, Oct. 31, 2011, ECF No. 260.

16      Defendant also complains about the giving of Closing Instruction Nos. 22 and 22a.  These

17  instructions were based on Ninth Circuit Model Jury Instruction 8.25 which is essentially the

18  *Pinkerton* charge.  The Defendant contends that because the Superseding Indictment did not assert

19  “Overt Acts” or “Pinkerton Theory,” the court erred by giving these instructions to the jury.  The

20  court disagrees with the Defendant.  The court gave these instructions with regard to the money

21  laundering charges.  While the Government did not allege that Defendant himself personally wired

22  the drug proceeds, Counts IV through XII of the Superseding Indictment alleged that Defendant

23  caused Mr. Paras and Mr. Ladonga to transmit the drug proceeds.  A party can be held responsible

24  for a substantive offense committed by a co-conspirator in furtherance of the conspiracy if (1) the

25  offense was a foreseeable consequence of the conspiracy and (2) the party had not withdrawn from

26  the conspiracy before the commission of the substantive offense.  *Pinkerton v. United States*, 328

27  U.S. 640, 646-48 (1946).  The court's instruction properly stated the rule and there was no error in

28  the giving of this instruction because the testimony of Mr. Paras supported the Government's theory

1   of the Defendant's role in the money laundering counts.

2          Defendant next asserts that the court erred when it told the jury in Closing Instruction No.

3   23 that "[t]he government is not required to prove precisely which defendant actually committed the

4   crime and which defendant aided and abetted." *See* Closing Jury Instr. at 30, ECF No. 191.

5   Defendant argues that this statement "relieved the government from its burden of proof" and relieved

6   the jury of "deciding whether the conspiracy's (sic) existed, who its members were, and whether or

7   not [Defendant] was a member of these conspiracys (sic)." Movant's Mem. of Law at 10, ECF

8   No. 294. The court did not err in giving Closing Instruction No. 23, which was patterned after Ninth

9   Circuit Model Jury Instruction 5.1.[9] Contrary to Defendant's assertions, the Ninth Circuit expressly

10  approved in *United States v. Vaandering*, 50 F.3d 696, 702 (9th Cir. 1995), the exact language the

11  Defendant finds objectionable. The instruction was not misleading or erroneous.

12         Defendant also argues this court erred when it "left out Ninth Circuit jury model 8.05B,

13  which instructs the jurors to decide whether the conspiracy charged in the indictment existed. If it

14  did, who at least some of its members were, whether the defendant was a member of that conspiracy

15  or some other conspiracy." Movant's Mem. of Law at 10, ECF No. 294. The Ninth Circuit does not

16  have a model jury instruction 8.05B. The closest standard instruction is Model Jury Instruction 8.22

17  Multiple Conspiracies. The commentary to this instruction states that it should only be used "when

18  the indictment charges a single conspiracy and the evidence indicates two or more possible

19  conspiracies." Ninth Circuit Model Jury Instructions 8.22 comment. The Superseding Indictment

20  charged more than one conspiracy, and thus the court did not err in failing to give this instruction.

21         Additionally, Defendant contends the court erred in giving instructions Nos. 24 (Mere

22  Presence), 25 (Knowingly - Defined) and 26 (Possession - Defined) because no counts were listed

23  for these instructions. Movant's Mem. of Law at 10, ECF No. 294. Closing Instruction No. 24

24  expressly stated that it applied for all "crimes charged." Additionally, the court notes that defense

25  _____

26         [9]   Since the Defendant's trial, Model Jury Instruction 5.1 has gone through three
    modifications: July 2013, June 2014 and March 2015. *See* Ninth Circuit Manual of Model Criminal
27  Jury Instructions, http://www3.ce9.uscourts.gov/jury-instructions/model-criminal (last visited
    October 22, 2015).
28

1   counsel specifically requested the giving of Closing Instruction No. 24. Trial Tr., vol. 4, 171-72,

2   Oct. 31, 2011, ECF No. 260. Defense counsel also did not object to instructions Nos. 25 and 26.

3   *Id.* at 165. The court did not err in giving these instructions since they were all standard instructions

4   patterned after Ninth Circuit Model Jury Instructions 6.10, 5.6 and 3.17 respectively.

5           Defendant argues that Closing Instruction No. 27[10] provides grounds for acquittal on Counts I

6   and II. Movant's Mem. of Law at 10-11, ECF No. 294. Defendant asserts that both Counts I and II

7   of the Superseding Indictment allege the conspiracy began about January 2009, yet the Government

8   acknowledged in closing arguments that Defendant joined in the conspiracy sometime in September

9   or October 2009 – nine to ten months from the date alleged in the Superseding Indictment.

10  Defendant's argument is without merit. The time frame alleged in the Superseding Indictment was

11  the period beginning January 2009 and continuing through March 2010. Even if the Defendant did

12  not join the conspiracy until sometime in September or October 2009, this time period falls within

13  the range of dates alleged in the Superseding Indictment, and thus Closing Instruction No. 17 would

14  not form the grounds for an acquittal on Counts I and II.

15          Defendant also raises various issues with regard to the jurors' conduct. First, Defendant

16  asserts that he "was not aware that juror notes were sent out, or what was requested in these notes."

17  Movant's Mem. of Law at 12, ECF No. 294. There were only three jury notes received in this case.

18  *See* ECF Nos. 193, 196 and 198. The first jury note was received by the court on November 1, 2011,

19  at about 5:00 p.m. *See* Jury Note, ECF No. 193. Given the lateness of the hour, the court advised

20  the jury it would respond the following morning after consulting with the lawyers.[11] *Id.* Counsel

21

22      [10]  This instruction was entitled "Dates" and stated in whole

23
        The superseding indictment charges that the crimes occurred on approximately a
24      certain date or between certain dates. The government does not have to prove that
        the crimes happened on those exact dates. But the government must prove that the
25      crimes occurred reasonably close to the dates alleged in the superseding indictment.

26  Closing Jury Instr. at 34, ECF No. 191.

27      [11]  The Minutes for November 1, 2011, indicate that after the note was received by the court,

28  [c]ounsel [were] called and instructed to appear on November 2, 2011, at 8:15 a.m." Minutes

1    appeared before the court on November 2, 2011, and, in the Defendant's presence, proceeded to

2    discuss the jury note with the court and how the court should respond. *See* Minutes (Nov. 2, 2011),

3    ECF No. 195, and Trial Tr. Excerpt at 3-5, Nov. 2, 2011, ECF No. 322. The Defendant was present

4    when the jurors were brought to the courtroom to clarify what exactly they were struggling with. *Id.*

5    at 6-11. The Defendant was also present when the court wrote its response to the jury question and

6    when the jurors answered in writing that the court's comments were sufficient. *Id.* at 11-15. Thus,

7    contrary to Defendant's claims, he was aware of the first jury note and what was requested in the

8    note. The second jury note was received on November 2, 2011, at 12 noon.[12] *See* Jury Note, ECF

9    No. 196. This note asked if the jury could begin deliberations the following morning at 9:00 a.m.

10   instead of starting at 8:30 a.m. as instructed, and the court responded "That's fine." *Id.* Even if the

11   Defendant was not aware of this note, he was not prejudiced in any way since the note dealt with a

12   ministerial matter and not a substantive issue. The final jury note was received on November 3,

13   2011, at 3:47 p.m. *See* ECF No. 198. The note stated that the jury had "reached a verdict on all

14   counts." *Id.* The court convened shortly thereafter, at about 4:12 p.m., and the court advised counsel

15   and the Defendant that the court had received a jury note and the contents of said note, including the

16   court's response. *See* Minutes (Nov. 3, 2011), ECF No. 200, and Trial Tr. Excerpt at 3, Nov. 3,

17   2011, ECF No. 325. Thus, the Defendant was aware of this last jury note.

18       The Defendant next asserts that he was not informed that one of the jury notes was sealed at

19   the request of the prosecutor. *See* Movant's Mem. of Law at 12, ECF No. 294. There is no basis

20   for such a claim since none of the jury notes were sealed. Each of the jury notes contained the name

21   of the foreperson. Consistent with policy of the Judicial Conference of the United States and the E-

22   Government Act of 2002, and any amendments thereto, the court redacted the foreperson's name

23   from the jury notes when the notes were filed and entered on the docket sheet. *See* Jury Notes, ECF

24   Nos. 193, 196 and 198. The unredacted notes containing the foreperson's name were filed under

25

26   _____

     (Nov. 1, 2011), ECF No. 192.

27

28       [12] The court only required the jury to deliberate until 12 noon that day so that jurors could
     attend All Soul's Day services.

1   seal. *See* Sealed Jury Notes, ECF Nos. 194, 197 and 199.  The Defendant has not shown how he was

2   prejudiced in any way by the court's filing of the jury notes in this fashion.

3          The Defendant also asserts the court erred with regard to the way it handled a jury issue that

4   arose between Juror No. 2 and Alternate Juror No. 1.  Defendant alleges the court removed Juror

5   No. 2 "without a hearing in open court" and failed to "poll the jurors or determine if there was juror

6   misconduct."  Movant's Mem. of Law at 13, ECF No. 294.  Defendant contends these alleged errors

7   are "grounds for a mistrial" and "violated [his] due process rights."  *Id.*  The record herein belies

8   Defendant's claims.  The court held a hearing in open court as soon as it was made aware of the

9   possible juror taint.  According to Juror No. 2, she ran into Alternate Juror No. 1 while she was

10  shopping on November 2, 2011, and he began inquiring whether the jury had reached a verdict and

11  what was the vote – whether it was "50/50 or 40/60."  Trial Tr. at 4, Nov. 3, 2011, ECF No. 205.

12  Juror No. 2 stated a verdict had not been reached and that she could not talk to him about how the

13  jury stood.  *Id.*  He then asked who was the foreman and whether there was anyone being "difficult."

14  Juror No. 2 said something to the effect that "there's some of us that are being difficult."  *Id.*

15  Alternate Juror No. 1 then said, "The guy wasn't inside, he was outside and so he wasn't involved

16  in anything."  *Id.*  Juror No. 2 did not respond to this comment.  *Id.* at 4-5.  Alternate Juror No. 1

17  proceeded to walk away but before he did, he whispered to Juror No. 2, "Just remember, not guilty

18  on everything."  *Id.* at 5.  Juror No. 2 walked away and was shocked by what Alternate Juror No. 1

19  told her.  *Id.*  She said she did not feel "threatened," just very "uncomfortable" about what had

20  happened.  *Id.*  Juror No. 2's husband eventually met up with her and noticed she looked

21  "distraught."  Trial Tr. at 3, Nov. 3, 2011, ECF No. 204.  Juror No. 2 told her husband what had

22  happened.  Trial Tr. at 5, Nov. 3, 2011, ECF No. 205.  They eventually went home, and Juror No.

23  2 went to lie down.  *Id.*  Her husband then called Deputy U.S. Marshal David Punzalan – who was

24  a family friend – and explained that his wife had been approached by Alternate Juror No. 1.  Trial

25  Tr. at 3, Nov. 3, 2011, ECF No. 204.  The husband "wanted to make sure that they were doing the

26  right thing by reporting it."  *Id.* at 4.  Deputy Marshal Punzalan notified Senior Inspector Tanya

27  Muna, who then notified the Chief Deputy and the court.  *Id.* at 5.  The court convened a hearing the

28  following morning, with the attorneys and the Defendant present.  *Id.* at 1; *see also* Minutes (Nov. 3,

1  2011), ECF No. 200.  With the parties present, the court separately questioned Deputy Marshal

2  Punzalan and Juror No. 2 about the events that occurred.[13]  Minutes (Nov. 3, 2011), ECF No. 200.

3  With the parties' concurrence, Juror No. 2 was replaced with Alternate Juror No. 2.  *Id.*  Contrary

4  to Defendant's assertion, the court polled all the jurors to determine the extent of the taint.  *See* Trial

5  Tr. Excerpt at 3-4, Nov. 3, 2011, ECF No. 323 and Trial Tr. Excerpt at 3-4, Nov. 3, 2011, ECF No.

6  324.  When Alternate Juror No. 2 arrived at the courthouse, she and the remaining jurors were

7  brought into the courtroom, and, with the Defendant and his attorney present, the court advised

8  everyone that Juror No. 2 had been excused and replaced with Alternate No. 2.  *Id.* at 3-5.  The court

9  asked all jurors – in the Defendant's presence – whether any of them had been approached by anyone

10  about the trial.  *Id.* at 3-4.  All of the jurors responded in the negative.  *Id.*  Before instructing the

11  jurors to begin their deliberations anew, the court reminded the jurors of their duty not to discuss the

12  trial or their deliberations with anyone.  *Id.* at 4.  Based on the record, the court finds the Defendant's

13  claims of error with regard to this matter to be meritless.  There are no grounds for a mistrial, and

14  the Defendant's due process rights were not  violated.

15          Finally, Defendant complains about a variety of issues that occurred before the grand jury.

16  He asserts that there was insufficient evidence presented to the grand jury, that he could not have

17  been involved in the vast drug conspiracy since he was already in federal custody on unrelated

18  charges, that "none of the evidence obtained by the informants was turned over" to the grand jury

19  and that the agent's testimony was "hearsay to bolster the government's case of some vast

20  conspiracy."  Movant's Mem. of Law at 15, ECF No. 294.  The court notes that the Federal Rules

21  of Evidence do not apply in grand jury proceedings.  Fed. R. Evid. 1101(d)(2); *see also Costelo v.*

22  *United States*, 350 U.S. 359, 363-64 (1956).  Even if the court were to assume that there was some

23  irregularity or error that occurred before the grand jury, the alleged error should have been raised

24  before trial.  *See* Fed. R. Crim. P. 12(b)(3)(A)(v).   Defense counsel never filed such a pretrial

25

26          [13]  The court took steps to ensure that Juror No. 2 and Alternate Juror No. 1 were separated
27  from and had no contact with the remaining jurors when they all reported to the courthouse the
morning of November 3, 2011.  Eventually , Alternate Juror No. 1 was appointed counsel (the
28  Federal Public Defender) and faced separate contempt charges. *Id*

1   motion. The court has reviewed the grand jury transcripts appended to the Defendant's Section 2255

2   motion and finds there was sufficient evidence from which the grand jury could find probable cause

3   existed to believe Defendant committed the crimes charged.  Furthermore, the court has already

4   found that the evidence presented at trial was sufficient to support the jury's guilty verdicts.

5   Accordingly, the Defendant's claimed errors have no merit.

6          D.     Prosecutorial Misconduct

7          Another ground raised in Defendant's Section 2255 motion is prosecutorial misconduct.  He

8   argues that "throughout the trial process the prosecutorial misconduct deprived [him] of his right to

9   a fair trial and due process of law." Movant's Mem. of Law at 19, ECF No. 294. Defendant asserts

10  that the prosecutor's "desire to win at all costs was unethical, outrageous, deceitful, and criminal in

11  her pursuit to obtain a conviction." *Id.* at 20-21.

12         "To warrant habeas relief, prosecutorial misconduct must 'so infect[ ] the trial with

13  unfairness as to make the resulting conviction a denial of due process.'" *Davis v. Woodford*, 384

14  F.3d 628, 644 (9th Cir. 2004) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).

15         Defendant alleges a variety of instances of prosecutorial misconduct.  First, he contends that

16  during opening statements, the prosecutor discussed matters that were outside the time frame alleged

17  in the Superseding Indictment.  He asserts this was "needless presentation of cumulative evidence

18  not charged." Movant's Mem. of Law at 20, ECF No. 294.  The court disagrees.  The Government

19  was simply laying a roadmap of its case.  The Government's theory was that Ms. Medina was

20  running a drug trafficking and money laundering scheme for many years and the Defendant became

21  a member of the conspiracy sometime between beginning on or about January 2009 through March

22  2010.  It was proper for the Government to give the jury some background information by referring

23  to matters that occurred prior to the Defendant's participation.  Additionally, even assuming the

24  statements were improper, the court instructed the jury at the beginning and again at the end of trial

25  that statements and arguments of the attorneys are not evidence.   Trial Tr., vol. 1, 146, Oct. 25,

26  2011, ECF No. 257 and Closing Instruction No. 6, ECF No. 191.  These curative instructions

27  neutralized any prejudice the Defendant claims resulted from said statements. Furthermore, the court

28  notes that when defense counsel began his opening statements, counsel again reminded the jury that

1   what he has to say or what the prosecutor said is not evidence.[14]  Trial Tr., vol. 1, 160, Oct. 25, 2011,

2   ECF No. 257.

3         The second instance of prosecutorial misconduct allegedly occurred during closing

4   arguments.  Defendant alleges the prosecutor improperly vouched for the credibility of Ms. Paras.

5   "In trying to bolster a witness's credibility, a prosecutor may not overstep the bounds of propriety

6   and fairness.  Improper vouching occurs when the prosecutor places 'the prestige of the government

7   behind the witness' by providing 'personal assurances of [the] witness's veracity.'"  *United States*

8   *v. Kerr*, 981 F.2d 1050, 1053 (9th Cir. 1992) (quoting *United States v. Roberts*, 618 F.2d 530, 533

9   (9th Cir. 1980).  Improper vouching also occurs where the prosecutor suggests that the testimony of

10  a government witness is supported by outside information not otherwise presented to the jury.

11  *United States v. Younger*, 398 F.3d 1179, 1190 (9th Cir. 2005).  However, "[i]t is not misconduct

12  for the prosecutor to argue reasonable inferences based on the record."  *United States v. Atcheson*,

13  94 F.3d 1237, 1244 (9th Cir. 1996).  "[P]rosecutors must have reasonable latitude to fashion closing

14  arguments, and thus can argue reasonable inferences based on the evidence, including that one of

15  the two sides is lying."  *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993), *as*

16  *amended on denial of reh'g* (Apr. 15, 1993).

17        Defendant complains about five separate passages made during the Government's closing

18  argument that he alleges was improper vouching.  *See* Movant's Mem. of Law at 22-23.  The first

19  remark questioned by the Defendant is when the prosecutor stated: "Fourth piece of evidence,

20  Elizabeth Paras.  I urge you to believe her." This statement does not constitute vouching.  The

21  prosecutor did not place the prestige of the Government behind the Ms. Paras nor did she provide

22  personal assurances of Ms. Paras's credibility.  In fact, after the prosecutor made this statement, the

23  _____

24        [14]  Defense counsel stated:

25        As the government indicated to you, this is a road map. And as the Judge indicated
          to you, it's not evidence. What we say, Ms. Johnson and I, is not evidence. You don't
26        need to take notes about what I have to say because it's not evidence in this case.
          We're just going to try to tell you what we believe the evidence will show.
27

28  Trial Tr., vol. 1, 160, Oct. 25, 2011, ECF No. 257.

1   government noted that the court would instruct the jury that it should weigh Ms. Paras's testimony

2   more carefully because the Government gave her immunity. Trial Tr., vol. 5, 21, Nov. 1, 2011, ECF

3   No. 261. The prosecutor here was merely advocating that the jury believe Ms. Paras.

4          Defendant also questions the propriety of the following remarks by the prosecutor:

5       •   In this case, you should, I submit, believe her because she didn't have to be

6           here."

7       •   Now, Elizabeth Paras heard that her ex-husband had been arrested and that

8           he's hoping for a favorable sentence before this [c]ourt, and she said, "I have

9           information. If that would help Ricardo, I'll tell you what I know."

10      •   And Elizabeth Paras is in the same situation. No one even knew about her.

11          Her name had not come up. She came forward, and to testify truthfully, she'd

12          have to admit that she was using ice. For her truthful testimony, we are not

13          going to turn around and charge her for a crime we didn't know she was

14          committing anyway.

15      •   But that's why you should believe Elizabeth Paras. She has, as the old

16          expression goes, no dog in this fight. She told the truth. She limited it to

17          what she knew. She didn't try to smear people. She didn't exaggerate. But

18          she said, "This is what I saw," and you should believe her[.]

19  Trial Tr., vol. 5, 21-23, Nov. 1, 2011, ECF No. 261.

20         The above statements do not imply that the prosecutor had outside information of Ms. Paras's

21  truthfulness that was not otherwise presented to the jury. Instead, the prosecutor argued reasonable

22  inferences based on the evidence and testimony presented. Anticipating defense counsel would

23  challenge Ms. Paras's credibility when he gave his closing arguments, the prosecutor simply

24  explained to the jury why they should believe Ms. Paras's testimony. There is nothing improper

25  about the prosecutor's statements. Additionally, any prejudice to the Defendant that may have

26  resulted from the alleged "vouching" was cured because the court instructed the jury that statements

27  and arguments by counsel are not evidence. Closing Instruction No. 6, ECF No. 191. There simply

28  is no evidence that the Government's actions during the course of this trial were inappropriate.

1    Additionally, Defendant asserts that during closing arguments the prosecutor improperly

2    relied on his prior conviction to support a finding of guilt. The court finds nothing improper about

3    the prosecutor's statements. Consistent with Rule 404(b) of the Federal Rules of Evidence, the

4    prosecutor correctly noted that his prior conviction may be considered for purposes of proving

5    motive, knowledge and intent. *See* Trial Tr., vol. 5, 19, Nov. 1, 2011, ECF No. 261.

6    Finally, Defendant alleges prosecutorial misconduct before the grand jury, including perjury

7    by the prosecutor and inconsistencies between the evidence at the first and second grand jury

8    presentments. The court has reviewed the grand jury transcripts appended to Defendant's motion

9    and finds no instance of prosecutorial misconduct. Additionally, the guilty verdicts obtained at trial

10   render any alleged errors in the grand jury proceeding harmless. *United States v. Mechanik*, 475 U.S.

11   66, 70-73 (1986); *United States v. Navarro*, 608 F.3d 529, 538-40 (9th Cir. 2010) (noting as

12   exceptions to this general principle structural errors involving racial or gender discrimination in jury

13   selection). The court accordingly denies any relief the Defendant seeks based on allegations of

14   prosecutorial misconduct as they relate to the grand jury.

15   E.      Ineffective Assistance of Counsel

16   Defendant's next claim is that the performance of his counsel at trial and on appeal were so

17   ineffective that, in essence, he was denied his constitutional right to counsel. The law regarding

18   ineffective assistance of counsel is well settled. A two-prong test has been articulated in *Strickland*

19   *v. Washington*, 466 U.S. 668 (1984), which held that to establish a claim of ineffective assistance

20   of counsel, a petitioner must show both deficient performance by counsel (the "incompetence

21   prong"), and that such deficient performance prejudiced his defense (the "prejudice prong"). *Id.*

22   at 687. The standard for assessing the performance of appellate and trial counsel is the same. *Alford*

23   *v. Rolfs*, 867 F.2d 1216, 1220 (9th Cir. 1989).

24   To demonstrate deficient performance by his counsel, or the incompetence prong, the

25   Defendant must show his counsel's performance was "outside the wide range of professional

26   competent assistance." *Id.* at 690. "A convicted defendant making a claim of ineffective assistance

27   must identify the acts or omissions of counsel that are alleged not to have been the result of

28   reasonable professional judgment." *Id.* at 690. He must show that his counsel's performance failed

1  to meet an objective standard of reasonableness. *Id.* at 689.

2       Under the prejudice prong, the Defendant "must show that there is a reasonable probability

3  that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

4  *Id.* at 694. That is, he must demonstrate "that counsel's errors were so serious as to deprive [him]

5  of a fair trial." *Id.* at 687. "An error by counsel, even if professionally unreasonable, does not

6  warrant setting aside the judgment of a criminal proceeding if the error had no effect on the

7  judgment." *Id.* at 691.

8       To succeed on a claim of ineffective assistance of counsel, a petitioner must satisfy both

9  prongs of the *Strickland* test. *See id.* at 700. However, the court's analysis of an ineffective

10 assistance of counsel claim does not require the mechanical application of the standards articulated

11 in *Strickland*. *Id.* at 696. The *Strickland* Court explained:

12      [T]here is no reason for a court deciding an ineffective assistance claim to approach
        the inquiry in the same order or even to address both components of the inquiry if the
13      defendant makes an insufficient showing on one. In particular, a court need not
        determine whether counsel's performance was deficient before examining the
14      prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it
        is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient
15      prejudice, which we expect will often be so, that course should be followed. Courts
        should strive to ensure that ineffectiveness claims not become so burdensome to
16      defense counsel that the entire criminal justice system suffers as a result.

17 *Id.* at 697. Furthermore, in evaluating a claim of ineffective assistance of counsel, the court "should

18 recognize that counsel is strongly presumed to have rendered adequate assistance and made all

19 significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. As stated by

20 the Ninth Circuit, "we 'indulge a strong presumption that counsel's conduct falls within the wide

21 range of reasonable professional assistance; that is, the defendant must overcome the presumption

22 that, under the circumstances, the challenged action might be considered sound trial strategy.'"

23 *Jones v. Ryan*, 583 F.3d 626, 636-37 (9th Cir. 2009) (quoting *Strickland*, 466 U.S. at 689 (citation

24 and quotation marks omitted)). "A fair assessment of attorney performance requires that every effort

25 be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

26 challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*,

27 466 U.S. at 689.

28      Thus, the court must examine the merits of each of Defendant's claims of ineffective

1   assistance of counsel to determine whether he has made a showing of deficient performance and

2   prejudice, and whether he has overcome the "strong presumption" that counsel has provided him

3   with "adequate assistance."

4           First, Defendant claims that his defense counsel failed to inform him or the court that counsel

5   had represented Mr. Villa. Movant's Mem. of Law at 16, ECF 294. The court finds no merit to this

6   claim. The court notes that Mr. Villa was originally represented by retained counsel, but said

7   counsel later moved to withdraw because Mr. Villa was no longer financially able to keep private

8   counsel. *See* Decl. of Counsel at ¶2, ECF No. 25. The court subsequently granted the motion and

9   appointed Danilo Aguilar to represent Mr. Villa. *See* Order (May 28, 2010), ECF No. 27. On July

10  16, 2010, Mr. Aguilar moved to withdraw, and the court appointed F. Randall Cunliffe to represent

11  Mr. Villa. *See* Order (July 16, 2010), ECF No. 34. On July 27, 2010, Mr. Cunliffe filed a motion

12  to withdraw because "a conflict [of interest] may exist[]" based on "a prior representation of co-

13  defendant Henry P. Fresnoza in a separate criminal matter." Motion to Withdraw as Counsel at 2,

14  ECF No. 35. Mr. Cunliffe's motion to withdraw was thereafter granted, and Thomas Fisher was

15  appointed to represent Mr. Villa. *See* Minutes (Aug. 2, 2010), ECF No. 36. The court finds nothing

16  deficient in trial counsel's actions. After his appointment, Mr. Cunliffe did his due diligence and

17  discovered he had a conflict of interest in representing Mr. Villa because of his prior representation

18  of Defendant in an unrelated case. He then filed a motion to withdraw. While Mr. Cunliffe may

19  have been appointed to represent Mr. Villa for a brief period, there is no evidence that Mr. Cunliffe

20  even had any communications with Mr. Villa about this case. The Defendant has failed to show how

21  Mr. Cunliffe's actions with regard to Mr. Villa in any way prejudiced the Defendant's right to a fair

22  trial.

23          Additionally, Defendant asserts counsel was also ineffective for failing to raise claimed

24  irregularities before the grand jury. Movant's Mem. of Law at 16-17. For example, Defendant

25  questions whether the first indictment actually "went in front of the Grand Jury." *Id.* at 16.

26  Defendant's allegations are conclusory since he supplies no evidence of misconduct in relation to

27  the grand jury. Defendant's claimed irregularities simply have no merit as discussed earlier in this

28  order. Trial counsel decision to not raise any challenges with regard to the grand jury presentations

United States v. Henry P. Fresnoza, Criminal Case No. 10-00028-003 and Civil Case No. 14-00022
Order Denying Motion to Vacate Pursuant to 28 U.S.C. § 2255

page 30 of 32

1  was neither deficient or prejudicial. The court has reviewed the record in its entirety and finds that

2  trial counsel effectively represented the Defendant in this case.

3  Finally, Defendant alleges defense counsel was ineffective because he failed to raise the

4  following issues on direct appeal: (1) sufficiency of the evidence, (2) the Rule 29 motion to

5  dismiss,[15] (3) the amendment to the indictment, (4) juror misconduct, (5) abuse of discretion by the

6  court, and (6) prosecutorial misconduct. Movant's Mem. of Law at 18, ECF No. 294. The court

7  has already discussed these issues above and found no merit to the Defendant's claimed errors or

8  issues. Appellate counsel's failure to raise an issue on appeal does not constitute ineffective

9  assistance of counsel if counsel had no reasonable likelihood of success in arguing the issue.

10  *Morrison v. Estelle*, 981 F.2d 425, 428 (9th Cir. 1992). Accordingly, based on the strong

11  presumption that appellate counsel provide adequate assistance, the court finds appellate counsel's

12  failure to raise the various issues on appeal was neither deficient nor prejudicial to the Defendant.

13  F.  Due Process Violation Based on Cumulative Effect of Errors

14  In Defendant's fourth claim, he contends that the cumulative effect of the errors committed

15  violated his right to due process. *See* Section 2255 Mot. at ¶17(d), ECF No. 294.

16  The Ninth Circuit has stated:

18  The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair. *Chambers [v. Mississippi]*, 410 U.S. [284,] 298 [and] 302-03 (1973) (combined effect of individual errors "denied [Chambers] a trial in accord with traditional and fundamental standards of due process" and "deprived Chambers of a fair trial"). The cumulative effect of multiple errors can violate due process even

---

22  [15] After the Government rested, defense counsel made a Rule 29 motion outside the presence of the jury. *See* Trial Tr., vol. 4, 106, Oct. 31, 2011, ECF No. 260. Defense counsel raised two specific issues: (1) the money laundering counts should be dismissed based on a lack of evidence that the Defendant was linked to the money being wired by either Mr. Ladonga or Mr. Paras, and (2) that Count III should be dismissed because there was a lack of evidence that the Defendant possessed the ice or intended to distribute it to another person and because the Superseding Indictment charged the Defendant with Possession with Intent to Distribute "ice" and Exhibit 14 proved that the substance was only 76% pure so it could not be "ice." *Id.* at 106-109. The court eventually denied the motion in its entirety. *Id.* at 128-32.
The Rule 29 issues also formed the basis of a portion of the Defendant's claims that the court abused its discretion, and are discussed *supra* at pages 17-18.

1    where no single error rises to the level of a constitutional violation or would
2    independently warrant reversal. *Chambers*, 410 U.S. at 290 n.3.

3    *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007).

4         The court has reviewed the entire record and finds Defendant has not suffered multiple errors

5    such that an accumulation of them would violate due process.  In fact, the court has found no errors

6    so there is nothing to accumulate.  This claim must also fail.

7         G.    Certificate of Appealability

8         Having denied Defendant's Section 2255 motion, the court must now decide whether to issue

9    a certificate of appealability ("COA").

10        Pursuant to Rule 11(a) of the Rules Governing Section 2255 Habeas Proceedings,

11   [t]he district court must issue or deny a certificate of appealability when it enters a
     final order adverse to the applicant.  Before entering the final order, the court may
12   direct the parties to submit arguments on whether a certificate should issue.  If the
     court issues a certificate, the court must state the specific issue or issues that satisfy
13   the showing required by 28 U.S.C. § 2253(c)(2). If the court denies a certificate, a
     party may not appeal the denial but may seek a certificate from the court of appeals
14   under Federal Rule of Appellate Procedure 22. A motion to reconsider a denial does
     not extend the time to appeal.
15

16        In the instant case, the court does not require the parties to present any arguments as to

17   whether a COA should issue.

18        Generally, a petitioner must make "a substantial showing of the denial of a constitutional

19   right" to warrant a COA.  28 U.S.C. § 2253(c)(2).  This requires a showing that "reasonable jurists

20   would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v.*

21   *McDaniel*, 529 U.S. 473, 484 (2000).  Based on the court's preceding analysis, the court concludes

22   that the Defendant has failed to make a substantial showing of a denial of a constitutional right and

23   that jurists of reason would not find it debatable whether the court was correct in any substantive or

24   procedural ruling.  The court therefore denies the Defendant a certificate of appealability.

25   ///

26   ///

27   ///

28   ///

1  **V.    Conclusion**

2        For the reasons set forth above, the court hereby denies Defendant's Motion to Vacate

3  pursuant to 28 U.S.C. § 2255.   The court also declines to grant Defendant a certificate of

4  appealability.

5        IT IS SO ORDERED.

 **/s/ Frances M. Tydingco-Gatewood**
             **Chief Judge**
**Dated: Oct 23, 2015**